CHARLES JONES *et al.*

*vs.*

WILLIAM H. THOMPSON and JANE M. THOMPSON.

New Castle, Sept. T. 1880.

*Persons of unsound mind ; protection afforded by equity ; transactions and conveyances by, when set aside.*

1. In cases of alleged want of mental capacity the test, in the absence of fraud, is whether the party had the ability to comprehend in a reasonable manner the nature of the affair in which he participated.

2. Where weakness of mind is not of itself a sufficient ground for equitable interference, it will nevertheless always constitute an important element in actual fraud.

3. If a transaction be in the slightest degree tainted with deceit, the intellectual imbecility of the party may be held, by a court of equity, to make out a case of actual fraud which otherwise might be incapable of proof.

4. The cause of mental weakness is immaterial. It may arise from injury to the mind, temporary illness, or excessive old age. In such cases any unfairness will be promptly redressed.

5. Where there is real weakness of mind in a person executing a conveyance, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper and reasonable application of the injured party or his representatives or heirs, interfere and set the conveyance aside.

6. When a conveyance is made by one in whom there is such an aggregation of peculiarities of life, conduct and language as to produce the conviction that his mind is not entirely sound, and the consideration therefor is grossly inadequate, a proper case for equitable interference arises, and a decree for cancellation of the deed will be authorized.

7. A court of equity will not set aside a voluntary deed executed by an old and infirm man, if it satisfactorily appears that the nature and effect of the deed were fully explained to him by some proper person before he executed it, and that no undue influence had been exercised over him ; but when it does not appear that the nature and effect of the deed were thus explained before its execution, and that he was not under undue influence, the case is different.

8. A person taking a voluntary conveyance from an old and infirm person, whether the relation between them is confidential or not, or that of consanguinity or otherwise, is bound to make it satisfactorily appear to the court that no undue influence was exercised over the grantor, and that he fully understood the character, nature and effect of his act.

9. Whenever business transactions with a person of weak mind are brought before a court of equity, and such transactions appear to be wholly against such person's interest, even if his weakness does not amount to total incapacity, but is greatly to the advantage of the other party; or where a conveyance by such a person is wholly without consideration, or is unconscionable, or is evidence of gross inattention to one's interests, and amounts to evidence of a gross want of the most ordinary prudence,—the court will require clear proof of a comprehension of the true nature and effect of the act so performed.

10. The above principles applied, and a conveyance, executed by a man of great weakness of mind, arising from age (he being about seventy-seven years old), of all his real estate to two of his children, to the exclusion of his other children, with whom he was on good terms, without consideration, and without its nature and effect being fully explained to him—declared void as against the heirs at law of the grantor.

BILL TO SET ASIDE A DEED.—This is a continuation, for final hearing, after necessary amendments for that purpose, of the preceding case, brought by information in the name of John B. Penington, Attorney General, on behalf of John Thompson, an insane person, at and by the relation of Charles. Jones *et al.*, against William H. Thompson and Jane M. Thompson.

After the announcement of the preceding decision of the chancellor on the motion to dismiss, a motion was made by the relators in the information, for leave to amend, by changing the information into a bill in the name of John Thompson, by his next friend Charles Jones, complainant, against William H. Thompson and Jane M. Thompson, defendants. This motion was allowed and the amendment made.

An appeal was taken to the Court of Errors and Appeals, where the decision and action of the chancellor were unanimously affirmed.

Thereafter John Thompson died, whereupon another amendment was allowed, whereby Charles Jones and Josephine, his wife, Thomas J. Horn, and Lee, his wife, and Clara Thompson, were substituted as complainants—the said Josephine, Lee and Clara being, together with the defendants, the children and only heirs at law of said John Thompson, deceased.

The suit then came before the chancellor for final hearing, on the testimony which had been taken.

*D. M. Bates* and *George H. Bates*, for complainants:

We present two distinct grounds upon which we ask a decree avoiding the deed in question : (1) mental incompetency of the grantor, John Thompson ; (2) that the deed was procured by undue influence.

If the first ground is sustained by the court, the second will become immaterial.

In considering the subject of mental capacity to make a deed or contract, or to perform any serious act of business, there are three conditions, under one of which every case must fall:

1. Ordinary, general sanity, in which the will stands for a reason. All acts by a man in this condition, if free from fraud and undue influence, however improvident, are established.

2. Total incompetency (whether from mania, imbecility, or other form of insanity), in which no act is established.

3. A greatly defective capacity, though short of total insanity, in which the court scrutinizes the act, and sustains it only when there is found to have been capacity sufficient for the act in question, and when the capacity, such as it is, has been exercised without fraud, circumvention or undue influence.

In the present case the evidence furnishes an instance of the second mental condition, of total incapacity, showing that—

I. The case is one of total mental incompetency on the part of John Thompson, resulting from a decay of his mental faculties through old age, probably accelerated by an injury to his head, and bringing him at the time of executing this deed (according to the medical testimony) into the condition defined as senile dementia, or imbecility caused by the decay of old age.

Although the case thus falls within one of the defined classes of insanity as treated in medical jurisprudence, no stress is laid on that consideration. The mental capacity of a party for the act in controversy is not determined by technical definitions of insanity. The test is whether, upon the evidence, the conscience of the court is satisfied that the grantor, whose deed is questioned, was at the time and in the act competent for that particular transaction. *Frazer* v. *Frazer*, 2 Del. Ch. 263 ; *Tozear* v. *Shields*, 8 C. E. Green, 509.

" Competency " implies at least two essentials, viz.: (1) understanding, or the power to comprehend the full nature and consequences of the act ; and (2) will, or the power to form and execute a purpose free from the control or dominion of another. *Guest* v. *Beeson*, 2 Houston, 263.

Rationality in some degree may exist with ability to con-

verse and to act coherently in a few matters of minor conse-
quence, and yet there be, from gross defect either of under-
standing or will, a total incompetency for any serious business
transaction.    Bish. Cont. §§ 288, 291; Ray's Essay on Testa-
mentary Capacity, found in The Sanitarian (the organ of the
Medico-Legal Society of New York) for Oct. 1877, Vol. 5,
No. 55, p. 433; see pp. 439, 440.

In cases of dementia, or that peculiar form of mental
unsoundness occurring from old age, with which, according
to the testimony of Doctors Kane and Draper, Mr. Thomp-
son was afflicted, the development of mental disease is strik-
ingly characterized by effects which terminate the contract-
ing and testamentary capacity even while some degree of
rationality in common-place matters remains.    Whart. & S.
Med. Jur. §§ 93, 94 ; Ray, Testamentary Capacity, pp. 437,
438.

It is well settled that the character of the act is largely
relied on by the courts as evidence of the rationality or irra-
tionality of the actor.    *Frazer* v. *Frazer*, 2 Del. Ch. 260,
264 ; Ray, Test. Cap. 442–444.    If, therefore, a contract or
will be itself irrational, the court will require strong extrinsic
evidences of mental soundness to sustain it.    *Frazer* v.
*Frazer*, *supra*.

II.  Supposing the chancellor was not satisfied that Thomp-
son was totally incompetent, still the evidence proves beyond
question that his mind was much below the average capacity
such as, even if not justifying a commission of lunacy, was
liable to be imposed upon.

The principle on which courts of equity deal with this
class of persons is neither, as a matter of course, to affirm or
avoid their acts, but to protect them in the exercise of such
capacity as they have.    It will therefore scrutinize their
transactions ; considering the nature of the act done, the
inducements leading to it, and the attending circumstances
and influences.    If the conscience of the court is satisfied that
such a grantor comprehended the nature and consequences of
the transaction, and exercised a deliberate and free judgment,

it will be sustained. But if the nature of the act or the attending circumstances justify the conclusion that the grantor's weakness has been taken advantage of, the deed will be set aside in equity, however valid it might be at law. *Gartside* v. *Isherwood*, 1 Bro. Ch. 560, took the first decided step in exercising this protecting power of equity. *Blachford* v. *Christian*, 1 Knapp, 73 (cited fully in 1 Wharton & S. Med. Jur. § 76), developes it more fully. There *Lord* Wynford lays down the doctrine, since followed in all the cases, thus : "A degree of weakness of intellect far below that which would justify such a proceeding (*i. e.*, in lunacy), coupled with other circumstances to show that the weakness, such as it was, had been taken advantage of, will be sufficient to set aside any important deed."

In 1 Story on Equity Jurisprudence, § 238, from a full review of the cases, *Justice* Story draws this conclusion, that "The acts and contracts of persons who are of weak understandings, and who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome by cunning or artifice or undue influence."

The doctrine thus defined by *Lord* Wynford and *Judge* Story has been expressly approved and followed in all cases where the question has arisen. *Cruise* v. *Cristopher*, 5 Dana, 181 ; *Wilson* v. *Oldham*, 12 B. Mon. 55 ; *Buffalow* v. *Buffalow*, 2 Dev. & B. Eq. (N. C.) 241 ; *Tracey* v. *Sacket*, 1 Ohio St. 54 ; *Gass* v. *Mason*, 4 Sneed, 497.

III. This deed is void because obtained by undue influence. This is a voluntary conveyance made by a weak-minded, aged man, largely made in the interest and through the active instrumentality of a party holding a close relation of trust and confidence to the grantor, and as largely to the detriment of the grantor or those having claims upon him. Such a conveyance is not to be sustained unless the conscience of the court is satisfied that it was made both understandingly and inde-

pendently; and the onus of showing this is very strongly cast upon the grantee.

By onus in these cases it° is not meant that to sustain such a deed the grantee must in all cases show affirmatively, by some specific evidence going to the particular act, the absence of fraud or influence; but that to sustain a grant made to one holding a relation of confidence or influence,—as, say, between parent and child,—the court must be satisfied, from all the circumstances in evidence, that the grantor comprehended the nature and effect of the transaction, and exercised in it a free discretion. Whether or not a deed was so executed may be, and usually is, determined by the nature and circumstances of the transaction and the condition of the parties, without direct proof as to the presence or absence of fraud or influence.

A gift by son to father, or father to son, may be so reasonable in itself, and between parties so independent of each other, as to exclude all presumption of fraud or influence and to dispense with any direct proof of understanding and independence in the act. On the other hand, when, as is usually the case, the relation between parent and child is one of much trust or influence, on the one part or the other, and especially when in such case the grantor is of feeble capacity, and the grant an improvident one and for the benefit of the grantee,—the presumption is strongly against the grant, and requires direct evidence of understanding and free will in the act itself; so that the result is this: that to sustain a grant made under such relations the court must be satisfied as to the absence of fraud and influence; but the strength of the onus to show this, or (more accurately) the measure of evidence to satisfy the court of its absence, will depend on the nature of the transaction and special circumstances of the parties.

Under this general proposition it may be remarked:

1. A broader proposition has been sustained, holding all voluntary conveyances without any special relation of confidence to impose this onus. The doctrine is thus stated in the English Note to *Huguenin* v. *Baseley*, 2 White & T. Lead.

·Cas. 1175, 1188 : " Even in the absence of any special rela-
tion between parties, where a person gains a great advantage
-over another by a voluntary instrument, the burden of proof is
undoubtedly thrown upon the person receiving the benefit,
and he is under the necessity of showing that the transac-
tion is fair and honest;" and the American Note is not less
emphatic. Id. 1192.

The proposition is fully sustained by a multitude of cases,
-of which the following will serve as examples : *Gibson* v.
*Jeyes*, 6 Ves. Jr. 266 ; *Hoghton* v. *Hoghton*, 15 Beav. 278 ;
*Cooke* v. *Lamotte*, Id. 234 ; *Blackie* v. *Clark*, Id. 600 ;
*Billage* v. *Southee*, 9 Hare, 534 ; *Phillips* v. *Mullings*, L. R.
7 Ch. App. Cas. 244 ; *Price* v. *Price*, 1 De Gex, M. & G.
-308 ; *Phillipson* v. *Kerry*, 32 Beav. 628 ; *Russell's Appeal*,
75 Pa. 269, 279, 289 ; *Tyler* v. *Gardiner*, 55 N. Y. 559.
The burden thus cast upon the donee is satisfied only by proof
that the donor comprehended fully what he was doing.
White & T. Lead. Cas. 1175.

But where any special relation of confidence is shown to
have existed between the donor and donee, the latter has
imposed upon him the further burden of proving how the
intention was produced (Id. 1172, 1175, 1192); and this seems
to mark the distinction between the two classes of cases.

2. The rule stated is not confined to certain conventional
relations, but extends as well to cases of confidence springing
from natural relations—and, further, to all cases of confidence,
however arising. In fact the expression of *Sir* Samuel
Romily, in the argument of *Huguenin* v. *Baseley*, that "The
relief stands upon a general principle applicable to all the
variety of relations in which dominion may be exercised by
-one person over another," has been practically adopted by the
courts as the rule governing the subject. *Dent* v. *Bennett*,
4 Mylne & C. 277, cited in 2 White & T. Lead. Cas. 1174.

There is no other limit to the application of this princi-
ple than the possibility of the acquisition by one person of
more than the ordinary influence over another. The prin-
-ciple is well and briefly stated by the vice-chancellor in

*Billage* v. *Southee*, 9 Hare, 540; *Turner* v. *Turner*, 44 Mo. 535.

The conventional legal relations to which the doctrine is applied with the utmost severity are those of trustee and *cestui que trust*, in dealing with the trust funds; attorney and client, guardian and ward, principal and general agent. With respect to these relations, the law forbids any dealing while the relation exists, and avoids all voluntary grants without reserve. Hence a trustee, attorney, guardian, or agent, who receives such grant from his *cestui que trust*, client, ward, or principal, is not permitted to show that it was a fair and proper exercise of bounty, but the law raises a conclusive presumption against the transaction.

But when the relation is a natural or confidential one, the grant is subjected to rigorous scrutiny and avoided, unless it appear to have been made understandingly and independently. *Lee* v. *Pearce*, 68 N. C. 77.

In this latter class of cases the presumption is, as we have seen, likewise against the grant, and casts the burden of proof upon the grantee. Unlike the conclusive presumption raised in the cases of conventional relations, it is a presumption of fact which may be rebutted,—only, however, by proof adduced by the grantee, or arising out of the circumstances.

No better evidence of the universality of the application of this principle need be offered than a reference to the great variety of relationships to which it has been applied, other than the conventional relations before named. The most important of the natural relations, that of parent and child, we may pass for the moment to notice some of those which being less near are more striking.

Spiritual adviser. The leading case—*Huguenin* v. *Baseley*, 1 White & T. Lead. Cas. 1156—was one falling under this particular class, and it was preceded by *Norton* v. *Relly*, 2 Eden, 286, and *Parfitt* v. *Lawless*, L. R. 2 P. & D. 462, where the doctrine was held applicable to gifts *inter vivos*, though not as to wills.

Spiritual medium. *Lyon* v. *Home*, L. R. 6 Eq. 655.

Medical attendant and patient. *Dent* v. *Bennett*, 4 Mylne

& C. 262 ; *Gibson* v. *Russell*, 2 Younge & C. 104 ; *Billage* v. *Southee*, 9 Hare, 534 ; *Ashwell* v. *Lomi*, L. R. 2 P. & D. 477, in which, even in case of a will, the onus was held to lie heavily upon the physician receiving the bequest.

Keeper of house for lunatics and person under his care. *Wright* v. *Proud*, 13 Ves. Jr. 136.

Widower and sister of deceased wife. *Coulson* v. *Allison*, 2 De Gex, F. & J. 521.

A man engaged to be married to grantor. *Page* v. *Horne*, 11 Beav. 227 ; *Cobbett* v. *Brock*, 20 Beav. 524 ; *Rockafellow* v. *Newcomb*, 57 Ill. 186.

Brother or sister. *Harvey* v. *Mount*, 8 Beav. 439 ; *Todd* v. *Grove*, 33 Md. 188 ; *Sears* v. *Shafer*, 6 N. Y. 268, 272 ; *Sharp* v. *Leach*, 31 Beav. 491.

Nephew and aunt. *Cooke* v. *Lamotte*, 15 Beav. 234.

Distant blood relations. *Long* v. *Mulford*, 17 Ohio St. 484.

Servant, and infant son of his master, or young master. *Osmond* v. *Fitzroy*, 3 P. Wms. 129 ; also note 1, citing many cases ; *Bridgman* v. *Green*, 2 Ves. Sr. 627.

Intimate friendly relations and implicit confidence in business matters. *Purcell* v. *McNamara*, 14 Ves. Jr. 91 ; *Custance* v. *Cunningham*, 13 Beav. 363 ; *Wilkinson* v. *Fowkes*, 9 Hare, 592 ; *Kay* v. *Smith*, 21 Beav. 522 ; *S. C.* affd. on appeal, 7 H. L. Cas. 750.

One who proffers his services as a mere friend. *Bayliss* v. *Williams*, 6 Coldw. 442, cited in 2 Lead. Cas. Eq. 1194.

And so, generally, it matters not from what relation or under what circumstances, if it exists and is unduly exercised, it is fatal to the transaction ; " a man being as much bound to act for the best interests of another, who has trusted him as a friend, as if he had been appointed a trustee or agent." *Turner* v. *Turner*, 44 Mo. 535; *M'Cormick* v. *Malin*, 5 Blackf. 509 ; Story, Eq. Jur. §§ 308, 311.

3. To no relation has this doctrine been applied with more stringency and uniformity than to that of parent and child. Story, Eq. Jur. § 309.

The cases which the rule is intended to guard against are not those of gifts between parent and child, when the age and circumstances of both parties are such as to put them on a fair and equal footing towards each other. The protection given by the rule is to the young and inexperienced child on the one hand, and the aged and dependent parent on the other. Ordinarily the rule is applied to avoid gifts from the child to the parent. 2 White & T. Lead. Cas. 1176, 1196 ; *Cocking* v. *Pratt*, 1 Ves: Sr. 400 ; *Baker* v. *Bradley*, 7 De G. M. & G. 597; *Wright* v. *Vanderplank*, 8 De G. M. & G. 133 ; *Savery* v. *King*, 5 H. L. Cas. 626 ; *Potts* v. *Surr*, 34 Beav. 543 ; *Chambers* v. *Crabbe*, Id. 457 ; *Hoghton* v. *Hoghton*, 15 Beav. 278 ; *Bergen* v. *Udall*, 31 Barb. 9 ; *Taylor* v. *Taylor*, 49 U. S. 8 How. 183 (12 L. ed. 1040); *Slocum* v. *Marshall*, 2 Wash. C. Ct. 397 ; *Harding* v. *Handy*, 24 U. S. 11 Wheat. 104 (6 L. ed. 429).

But in old age the attitude of the parties is reversed, the parent then becomes the dependent one and falls under the protection of the court. 2 White & T. Lead. Cas. 1206 ; *Whelan* v. *Whelan*, 3 Cow. 537 ; *Martin* v. *Martin*, 1 Heisk. 644 ; *Brice* v. *Brice*, 5 Barb. 533 ; *Comstock* v. *Comstock*, 57 Barb. 453 ; *Highberger* v. *Stiffler*, 21 Md. 338.

4. Especially are the courts suspicious of such conveyances when made to one child to the prejudice of the rest, and in such cases the fact of general confidence and influence, coupled with old age or weakness or the agency of the child taking, are held conclusive of undue influence. *Marvin* v. *Marvin*, 3 Abb. N. Y. App. 193, cited in 2 White & T. Lead. Cas. 1266.

The purpose for which the influence is exercised should be the criterion whether or no it was undue, rather than the way in which it is acquired. 2 White & T. Lead. Cas. 1210.

IV. So far from the defendant having met the onus so thrown on him, by showing that the conveyance was made understandingly and independently of influence, on the contrary, it is the irresistible conclusion from the evidence that it was the result of undue influence.

1. What is " undue influence ?"

This is a term so well understood in the law that it has acquired a definite technical meaning. The result of all the cases, many of which we cite, shows it to be a dominating influence, acquired by one mind over another through fear, affection, or other cause, in consequence of which the will of another becomes in effect substituted for that of the party acting.

There may be a question whether the bare existence of such an influence will avoid the act of a weak-minded person, done under disinterested guidance and to just and reasonable ends; but there can be no question when it is exercised for selfish or improper objects.

2. Demonstrative evidence of influence is found in the main, undisputed features of this case,—the old age and mental weakness of the grantor, the grossly improvident character of the grant, in stripping himself of all his estate, the unnatural exclusion of his other children having equal claims by nature and towards whom no estrangement appears, the concealment from the other children of the whole transaction, the utter want of premeditation, the relation of William H. Thompson to the grantor as his son and business manager, and his agency in procuring the execution of the deed so largely in his own interest.

Services between father and son or other relatives, under such circumstances as exist here, in the absence of a special contract, raise no legal obligation. Chitty, Cont. 575, note 1; *Davies* v. *Davies*, 9 Car. & P. 87; *Mariner* v. *Collins*, 5 Harrington, 290. And even were it fully proved that the father did, in the way of bargain, for any such consideration, agree to convey half the farm to his son, it would present a case of such grossly inadequate consideration as to be equally demonstrative of fraud or undue influence, as is the case in its present real character of a gift.

From circumstances such as those shown to exist in this case, the courts infer undue influence without direct proof of it in the act. *Griffiths* v. *Robins*, 3 Madd. 191; *Dent* v. *Bennett*, 4 Mylne & C. 269; *Gibson* v. *Russell*, 2 Younge &

5 Del. Ch.　　　　25

C. 104; *Brooke.* v. *Berry,* 2 Gill, 83'; *Harvey* v. *Mount,* 8 Beav. 439 ; *Chambers* v. *Crabbe,* 34 Beav. 457 ; *Cobbett* v. *Brock,* 20 Beav. 524 ; *Hoghton* v. *Hoghton,* 15 Beav. 278 ; *Bridgman* v. *Green,* 2 Ves. Sr. 627 ; *Rockafellow* v. *Newcomb,* 57 Ill. 186 ; *Marvin* v. *Marvin,* 3 Abb. N. Y. App. 193 (2 White & T. Lead.Cas. 1267); *Whelan* v. *Whelan,* 3 Cow. 537 ; *Highberger* v. *Stiffler,* 21 Md. 338 ; *Martin* v. *Martin,* 1 Heisk. 653 ; *Brice* v. *Brice,* 5 Barb. 553 ; *Bergen* v. *Udall,* 31 Barb. 9 ; *Conant* v. *Jackson,* 16 Vt. 335, 350.

4. It does not satisfy the protection which the courts throw around questions in such circumstances to show that the deed was read and understood to be a conveyance. It is required, additionally, to appear that the grantor understood the nature and effect of it. It must also, in cases where the circumstances raise the presumption of undue influence, appear not only that he understood that he was conveying away his property and that he intended to do it, but it must also appear, to use the phrase of *Lord* Elden, "how the intention was produced." *Huguenin* v. *Baseley,* 2 White & T. Lead. Cas. *578, *582, *600,. 1172, 1175, 1193 ; *Hoghton* v. *Hoghton,* 15 Beav. 278 ; *Sharp* v. *Leach,* 31 Beav. 491 ; *Coutts* v. *Acworth,* L. R. 8 Eq. 558 ; *Phillipson* v. *Kerry,* 32 Beav. 628 ; *Cooke* v. *Lamotte,* 15 Beav. 234 ; *Wollaston* v. *Tribe,* L. R. 9 Eq. 44 ; *Nanney* v. *Williams,* 22 Beav. 452 ; *Phillips* v. *Mullings,* L. R. 7 Ch. App. 246 ; *Hall* v. *Hall,* L. R. 14 Eq. 365; *Todd* v. *Grove,* 33 Md. 188 ; *Russell's Appeal,* 75 Pa. 269 ; *Brock* v. *Barnes,* 40 Barb. 521 ; *Bergen* v. *Udall,* 31 Barb. 9 ; *Long* v. *Mulford,* 17 Ohio St. 484, 504 ; *Boyd* v. *Boyd,* 66 Pa. 288 ; *Case* v. *Case,* 26 Mich. 484 ; *Greenfield's Estate,* 14 Pa. 489, 501 ; *Tyler* v. *Gardiner,* 35 N. Y. 559, 589.

V. Were it true that Thompson had sufficient capacity, and the conveyance not made under undue influence, it would then appear to have been an absolute deed, obtained by the impression fraudulently made that it was for the benefit of the whole family—fraudulent on William's part, as his subsequent claim to hold absolutely demonstrated ; sincere on Jane's part, as her subsequent action shows. Her position was that of an innocent instrument of his fraudulent purpose.

The effect is none the less to avoid the conveyance altogether. It cannot be rectified. 2 White & T. Lead. Cas. 1189; *Phillipson* v. *Kerry*, 32 Beav. 628; *Brown* v. *Kennedy*, 33 Beav. 133.

. The conveyance, if void as to one, is void as a whole—as well against one grantee as the other. 2 White & T. Lead. Cas. 1259, 1261; *Whelan* v. *Whelan*, 3 Cow. 537.

*W. G. Whiteley*, for defendant William H. Thompson :

Mere weakness of mind, short of dotage, idiocy or senility—whether produced by old age or other causes—is not enough to call for interference of a court of chancery; but if there is imposition or undue influence, it will be very often an important and controlling ingredient in determining the question of fraud. *Blachford* v. *Christian*, 1 Knapp, 73; *Ball* v. *Mannin*, 3 Bligh, N. R. 1; *Lewis* v. *Pead*, 1 Ves. Jr. 19; *Villers* v. *Beaumont*, 1 Vern. 100; *Greer* v. *Greers*, 9 Gratt. 330; *Brown* v. *Torrey*, 24 Barb. 583; *Newhouse* v. *Godwin*, 17 Barb. 236; *Van Alst* v. *Hunter*, 5 Johns. Ch. 148; *Smith* v. *Beatty*, 2 Ired. Eq. 456; *Huguenin* v. *Baseley*, 14 Ves. 273; 3 Lead. Cas. Eq. 136.

What is imposition or undue influence?

" Imposition " is defined to be constraint, deception, fraud, artifice, trick.

. It is not contended upon the other side that there was any constraint put upon the old man in executing or preparing for the execution of the deed, or artifice used, or trick, to procure his signature ; nor is there any proof made of any deception or fraud practiced upon him.

The question of actual imposition may therefore be dismissed. There remains the question of undue influence.

There were no threats, no force, no coercion, destroying the old man's free agency attempted to be shown—far less, proved.

Without this a court of chancery will not interfere, unless under some peculiar cases arising in case of parent and child, hereafter to be noticed. The influence arising from kind

offices, springing from attachment or affection, will not vitiate a deed. *Gardner* v. *Gardner*, 22 Wend. 526; *Williams* v. *Gonde*, 1 Hagg. Eccl. 577.

In the case in Wendell, 533, Cowen, *J.*, in delivering the opinion of the court, says—quoting the language of *Sir* John Nicoll in the case in 1 Hagg. Eccl. 577 : " There was the general influence of an active, bustling, high-spirited wife over a good-natured, easy husband ;" " but," he adds, " I can find no trace of any unfair importunity, on the part of the wife, to induce him to alter his will, or ·do any testamentary act."

The general influence arising from his affection for and deference to his wife, the learned judge refuses to admit as matter of suspicion. He says in another place: " Indeed, it would be extraordinary if the influence of affection and of warm attachment is to take away the power of benefiting the object of that regard. The influence to vitiate an act must amount to force and coercion, destroying free agency ; it must not be the influence of affection and attachment; it must not be mere desire of gratifying the wishes of another ; for that would be very strong ground in favor of a testamentary act. Further, there must be proof that the act was obtained by this coercion, by importunity that could not be resisted ; that it was done merely for the sake of peace, so that the motive was tantamount to force and fear." To same effect is *Van Alst* v. *Hunter*, 5 Johns. Ch. 148–160 ; *Clarke* v. *Sawyer*, 3 Sandf. Ch. 351, 425 ; *Small* v. *Small*, 4 Maine, 226 ; *Lowe* v. *Williamson*, 1 C. E. Green, 82; *Trumbull* v. *Gibbons*, 2 Zab. 117.

It is said in the American Note to *Huguenin* v. *Baseley*, 2 White & T. Lead. Cas. 1156, that fraud and mistake will vitiate and avoid a conveyance without regard to the source whence they originate. But in order to avoid a grant on the ground of undue influence, it must be shown : (1) that it existed, and (2) was exercised for an undue and disadvantageous purpose. The first point, it is said, may be inferred from the relative or actual positions of the parties, but the latter must be determined by an examination into the nature and results of the transaction.

1. What inference of undue influence from the actual position of the parties, here father and son.

It is shown, I think, that any inference from affection or attachment is not damaging.

2. There, then, must be something for the court to infer coercion, etc.; as has been stated, the testimony is most barren upon this point—not a word or syllable looking even towards it; no misrepresentation; nothing showing a tendency even to destroy the old man's free agency.

In each of the following cases there was some circumstance, some misrepresentation, some act on part of grantee, etc., which did, or might in the opinion of the court, mislead or deceive the grantor, the father: *Martin* v. *Martin*, 1 Heisk. 644; *Brice* v. *Brice*, 5 Barb. 533; *Comstock* v. *Comstock*, 57 Barb. 453; *Highberger* v. *Stiffler*, 21 Md. 338; *Harding* v. *Handy*, 24 U. S. 11 Wheat. 104 (6 L. ed. 429); *Taylor* v. *Taylor*, 49 U. S. 8 How. 183 (12 L. ed. 1040); 3 Lead. Cas. Eq. 127.

In *Slocum* v. *Marshall*, 2 Wash. C. Ct. 397, there was direct misrepresentation, as to holding the property conveyed, which induced the grant.

There is nothing in the relation of husband and wife, parent and child, or other relatives, to preclude one from accepting a benefit of a gift from the other; and the better opinion is that the fact that such a gift has been conferred, or contract made, will not warrant an inference that it has been procured by undue influence. 3 Lead. Cas. Eq. 144; *Small* v. *Small*, 4 Maine, 220; *Hardy* v. *Van Harlingen*, 7 Ohio St. 208; *Van Deusen* v. *Rowley*, 8 N. Y. 358; *Greenfield's Estate*, 24 Pa. 232.

If the relation existing between John and William H. Thompson, that of father and son, raises any presumption of undue influence, it is rebutted by proof that the benefit was intended, and that the intention to confer it arose in the mind of the donor, and was carried into execution without any improper urgency or persuasion on the part of William H. Thompson; and this proof is supplied when it is shown that

grantor was of sufficient mind to make the deed, and that contents of the deed were fully made known to him at execution of the deed, or that he read it and understood it himself; and this proof is increased if there are any reasons shown why he should cut off the other children, viz., to pay for Henry's long services, and because the other members of the family had deserted him. *Crispell* v. *Dubois*, 4 Barb. 393–399.; *Eyre* v. *Potter*, 56 U. S. 15 How. 52 (14 L. ed. 596).

THE CHANCELLOR.—In cases of alleged want of mental capacity, the test is whether the party had the ability to comprehend, in a reasonable manner, the nature of the affair in which he participated. This is the rule in the absence of fraud, for fraud when present introduces other principles. 8 C. E. Green, 511. This ability so to comprehend necessarily implies the power to understand the character, legal conditions, and effect of the act performed.

Where weakness of mind is not of itself a sufficient ground for equitable interference, it will nevertheless always constitute an important element in actual fraud. If a transaction be in the slightest degree tainted with deceit, the intellectual imbecility of the party may be held by a court of equity to make out a case of actual fraud which otherwise might be incapable of proof.

The cause of mental weakness is immaterial. It may arise from injury to the mind, temporary illness, or excessive old age. In such cases any unfairness will be promptly redressed. See Bisph. Eq. 288.

The rule by which a court should be governed in setting aside a conveyance is thus stated by the Supreme Court of the United States in the case of *Allore* v. *Jewell*, 94 U. S. 511 (24 L. ed. 264): "It may be stated as settled law that whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, —a court of equity will, upon proper and reasonable appli-

cation of the injured party or his representatives or heirs, interfere and set the conveyance aside."

In the case of *Harding* v. *Handy*, 24 U. S. 11 Wheat. 125 (6 L. ed. 435), *Chief Justice* Marshall says: "If these deeds were obtained by the exercise of undue influence over a man whose mind had ceased to be the safe guide of his actions, it is against conscience for him who has obtained them to derive any advantage from them. It is the peculiar province of a court of conscience to set them aside. That a court of equity will interpose in such a case is among its best settled principles."

There may be many peculiarities of life, conduct and language of a person, which, considered singly, may not show a want of capacity to transact business, but which when united in the same person may and will create an impression which may amount to a conviction that his mind is not entirely sound; and when such is the case all transactions relating to his property will be narrowly scanned by a court of equity, whenever brought under its cognizance. When a conveyance is made by one in whom there is such an aggregation of peculiarities, and the consideration is grossly inadequate, these circumstances will make the case a proper one for equitable interference, and will authorize a decree for the cancellation of the deed.

A court of equity will not set aside a voluntary deed executed by an old and infirm man, if it satisfactorily appears that the nature and effect of the deed were fully explained to the grantor by some proper person before he executed it, and that no undue influence had been exercised over him; but when it does not appear that the nature and effect of the deed were thus explained before its execution, and that he was not under undue influence, the case would be different.

A person taking a voluntary conveyance from such an old and infirm person, whether the relation existing between them is confidential or not, or that of consanguinity or otherwise, is bound to make it satisfactorily appear to a court that no undue influence was exercised over the grantor; and that he

fully understood the character, nature and effect of the act.
he did.

The person taking such voluntary conveyance under such
circumstances should be held to this amount of proof of fair-
ness, because he might well have surrounded the grantor with
proper safeguards, and exempted himself from the imputa-
tion of improper motives, by causing to be present those who
would be able to fully show all the circumstances surrounding
the transaction.

A court of equity will sedulously guard and protect the
rights of persons of weak mind, and secure such persons from
imposition and fraud by those possessing greater mental
capacity and thereby able to practice imposition upon them.
And whenever business transactions with such persons are
brought in review before a court of equity, and such
transactions appear to be wholly against their interest, even
if such weakness does not amount to total incapacity, but
is greatly to the advantage of the other party ; or when
a conveyance by such person is wholly without considera-
tion, unconscionable, or where it is evidence of gross inat-
tention to one's interests, and amounts to evidence of a gross
want of the most ordinary prudence and sense of personal
interest—a court of equity will require clear proof of a com-
prehension of the true nature, character and effect of the act
thus performed.

I deem it unnecessary to refer to the numerous authorities
sustaining the views I have thus presented. They are fully
sustained by the adjudged cases, which are easily accessible to
all. Nor do I deem it necessary to refer in detail to the
evidence in this cause. Much of it is unfit for repetition.

The testimony of the daughter of John Thompson, one
of the defendants, who testifies against her interest, as also
that of Mrs. McDaniel, who had long been intimate in the
family of Thompson, if worthy of credit, establishes a case,
not only of great mental weakness, but one of almost total
imbecility. These witnesses are not discredited.

Other witnesses testify that the grantor was rational when

they met and conversed with him, or had occasion to confer with him upon affairs which they detail; and yet others produced by the complainants testify differently.

It is difficult implicitly to believe everything to which some of the witnesses for the complainants testify, 'if full credit be given to the witnesses for the defendant, and if those witnesses of the defendant be considered as possessing full opportunities for forming correct opinions.

The testimony of Doctors Kane and Draper is entitled to great weight. It is true they did not make their examination of the old man until more than a year after the deed was executed, but they made it with great care. They have the reputation of being skillful and learned physicians, and they say that when they examined John Thompson he was in a state of senile imbecility, and that, humanly speaking, it was impossible that, at the time of the execution of the deed, the grantor could have been competent to transact business of that character. I do not repeat their words, but state the substance of their testimony.

We have no evidence as to why the deed was executed, except the statement of the daughter, one of the defendants. If she is to be credited, the idea of a conveyance or disposition of his farm by her father, and of placing it in the care or under the control of William Henry, the son, and the real defendant in the cause, originated with William, her mother, and herself; that the old man was never told of it nor consulted about it until the afternoon of the day when the conveyance was executed; that on that afternoon her brother asked her if the subject had been mentioned to their father, and, being told that it had not, he said it had better be done, as the conveyancer or notary would be out that evening.

These are not literally, perhaps, her words, but this is in substance and effect her testimony in this respect. She further states that the instrument of writing to be signed by her father was not understood by her and her mother to be a deed, but an assignment for the benefit of all John Thompson's children, and to prevent the farm from being sold or going out of the family after his death.

William had previously gone to Wilmington and there saw a conveyancer, Mr. Farra; told him he wished him to draw a deed for the conveyance of the farm by his father to himself and his sister. Being asked by the conveyancer if the family was aware of the intended conveyance, he replied affirmatively.

The deed was drawn and, after Mr. Farra's arrival at the house, was handed by him to the old man, who read it over leisurely; after which, being asked by Mr. Farra if he knew that he was deeding or conveying away his farm, and replying that he did, the old man executed the deed, which was also executed by his wife after it had been read over to her by Mr. Farra in, perhaps, the back part of the room where the old man, his wife, William, the aforesaid daughter, and Mr. Farra then were.

Mr. Farra, it is conceded, is a highly respectable man; he was satisfied that old Mr. Thompson knew what he was doing, and had no doubt of his mental capacity to understand the character of the act he was doing.

The signature of John Thompson to that deed is plainly and distinctly written. It is remarkably so, to be the writing of an aged and physically infirm old man.

I cannot reconcile all the testimony in this case so as to make it all conclusively tend to one and the same result; not that the witnesses directly contradict one another when speaking in reference to any particular fact, but because, if believing the facts and circumstances deposed to by some, I could not reasonably expect the existence of facts and circumstances deposed to by others.

The material facts necessary to a proper decision of this case, and which I think are proved before me, are : (1) that the farm conveyed by John Thompson, being the whole of his real estate, to his son, William H. Thompson, and daughter, Jane M. Thompson, the defendants, was worth at the time it was conveyed about $15,000 or $20,000; (2) that the grantor then had living five children, between whom and their father no alienation, or cause of alienation of feeling, is proved to

have existed; (3) that the personal estate of John Thompson was small in value; (4) that the design of conveying his real estate as he did is not proved to have originated with himself, but may reasonably be inferred from the evidence to have originated with others—William H. Thompson and his sister, the other defendant, being of the number; (5) the conveyance was without consideration, the $5,000 mentioned in the deed as the consideration never in fact having been paid or secured to be paid, and being but nominal in amount and grossly inadequate, even had it been paid or secured to be paid. (6) that John Thompson, at the time he conveyed his farm to his son and daughter, the defendants, as above stated, was a person of great weakness of mind arising from age—he then being about seventy-seven years of age—and increased perhaps by other physical causes not fully shown by the testimony ; (7) that the nature, character and legal effect of the instrument of writing he signed, and of the act he was about to do, were not fully or sufficiently explained to him before he executed the conveyance, the questions asked by the conveyancer, and his answers thereto, not being sufficient proof that he understood or comprehended the nature and legal effect of the act he did at the time he did it.

It follows, I think, from these circumstances and considerations, that the grantees should not be permitted to avail themselves of any benefit under the grant, and that the conveyance should be declared void as against the heirs at law of John Thompson, and that the deed of conveyance should be ordered to be canceled; and it is so ordered, adjudged and decreed.

Let a decree be drawn accordingly.