HERMAN GREENBAUM, Administrator *de bonis non, cum testamento annexo,* of the Estate of Samuel Greenbaum, deceased,

*vs.*

MAX KEIL, NATHAN MILLER and LENA ROTH, individually and as Administratrix of the Estate of IGNATZ ROTH, deceased; and LEO KEIL, SAMUEL F. KEIL, DAVID S. KEIL, HOWARD A. MILLER, HENRIETTA MILLER and RICHARD MILLER, voting trustees in respect of certain of the shares of the capital stock of MARKET STREET REALTY CO., a Delaware corporation, by virtue of a voting trust agreement, dated May 14, 1946.

*New Castle, November 22, 1948.*

James R. Morford of the firm of Marvel & Morford, and *Morton E. Evans,* for plaintiff.

*Morton E. Evans,* for defendant Lena Roth, individually and as administratrix of the estate of Ignatz Roth deceased.

*S. Samuel Arsht,* of the firm of Morris, Steel, Nichols & Arsht, for remaining defendants.

SEITZ, Vice-Chancellor: Plaintiff is the successor in interest to one of four stockholders who originally owned equal amounts of all the outstanding stock in a small corporation. By this action he seeks to be restored to a position of stock equality by having this court set aside or modify an issuance of additional shares in September, 1920, to the original stockholders other than plaintiff's predecessor in interest.

We must project ourselves backward some twenty-nine years and try to blow away the dust of time and penetrate the curtain of death which now conceal the transaction under attack. In 1919 one Samuel Greenbaum believed that certain real estate in Wilmington known as 802-804 Market Street could be purchased and profitably exploited when that portion of the city became part of the business district.

Being unable to finance the purchase alone, principally because he was then building the so-called Aldine theatre, Greenbaum invited three of his friends, Max Keil, Nathan Miller and Ignatz Roth, to participate in the deal with him. These four gentlemen will hereafter be referred to collectively as the "originators."

Each of the four originators put up at the outset the sum of $7,500. This money, along with a mortgage of about $130,000, was used to purchase the Market Street properties. Originally title to the properties was taken in the name of Keil, but shortly thereafter the property was deeded to a corporation known as Market Street Realty Company (hereinafter called the "Corporation"). The Corporation's only business since that time has been the holding of these properties.

Each of the four originators received 75 shares of $100. par value stock for his initial investment of $7,500—the Corporation has only one class of stock. In May, 1920, about $8,000 was needed to curtail a mortgage on the properties. Each of the originators was credited with having put up $2,000 for this purpose, and each in return received 20 additional shares of stock. As of this date each originator therefore owned 95 shares of stock.[1] The certificates for these shares were signed by Keil as president and Greenbaum as treasurer.

In early 1920 the Corporation was required to execute two corporate notes each for $10,000. All of the originators were accommodation endorsers on the notes. Later in the same year the bank demanded certain payments on the notes. We know that Keil, Miller and Roth each advanced $250 to the Corporation. The corporate records show this advance by each as having been made on August 17, 1920

---

[1] I ignore the one share issued to William G. Taylor. It is suggested that he was to be used as an "umpire", but I find it unnecessary to consider his significance in this case.

as a "subscription".[2] It is clear to me that this $750 was paid to the bank on account of the loans. On September 17, 1920, a payment of $2,500 was due the bank and the Corporation did not have the money to pay it. The bulk of this money was again procured from advances made by Keil, Miller and Roth. They each advanced $550 and these advances are listed in the corporate records under date of September 17, 1920 as subscriptions.

As heretofore stated, on September 17, 1920—the day the $2,500 bank payment fell due—Keil, Miller and Roth each advanced $550 to the Corporation. This sum, when added to the $250 advanced by each under date of August 17, 1920, meant that according to the corporate records each had then advanced $800 for subscriptions. Thus, the advance made by each of the originators other than Greenbaum was equal to the par value of the 8 shares issued to each of them, and evidenced by certificates dated September 15, 1920. True, the certificates were not receipted for on the stub of the stock certificate book until September 17, 1920. However, it is undisputed that the Corporation received the $800 from the three originators other than Greenbaum, and that the Corporation made the August and September payments to the bank. These certificates for the 8 shares to Keil, Miller and Roth admittedly bear the signatures of Keil as president and Greenbaum as treasurer. At the time these certificates were executed, the bylaws authorized either the president or vice-president and the secretary or treasurer to sign the certificates. Consequently, Greenbaum's signature was not indispensable, yet it was procured by the other three originators.

On the same day the $2,500 payment was made to the

---

[2] Plaintiff argues that this date is erroneous because it appears in the cash book following an entry of September 16, 1920. Defendant points out that many entries in the cash book are out of chronological order. Assuming that the entries were made after September 16, 1920, and further assuming that the $750 was not even received until September 17, 1920, nevertheless, I do not believe it is of real significance as I view this case.

bank (September 17, 1920), the Corporation was required by the bank to sign renewal notes for the unpaid balance. The bank also requested the originators to endorse them. On the same day or shortly thereafter—the parties disagree —all the originators signed the following agreement dated September 17, 1920:

"You [Greenbaum] are endorser on two promissory notes of Market Street Realty Company for Ten Thousand Dollars each, and it is necessary that payments on account of said notes be made by the endorsers, as the Company is not in a position to make any payments at the present time. We, the undersigned [Keil, Miller and Roth], being the other three endorsers on said promissory notes, agree to make payments on account of said notes and finally to pay said notes in full, if necessary, and will also take care of your payments on said notes, provided you assign unto us seventy-five shares of the capital stock of Market Street Realty Company, which you now own, and authorize us to hold said stock until you re-imburse us for the amount of principal and interest which we pay for you on account of said notes. And provided further, that in case we sell our stock in Market Street Realty Company that we are also authorized to sell the seventy-five shares assigned by you to us for the same price, and to deduct the payments made by us aforesaid, and to turn over the balance unto you."

Pursuant to this agreement Greenbaum delivered to the other originators 75 shares of the stock. He had theretofore assigned his other 20 shares to them to secure other money owed the Corporation. Parenthetically, the endorsers on the notes were never required to make any payments as endorsers.

On January 8, 1921, Greenbaum committed suicide. It came as a great surprise. He was survived by a then invalid widow and three children, Joseph, Marion and Herman, then 21, 20 and 17 years of age, respectively. One of the originators, Roth, was Mrs. Greenbaum's father. He was the executor of Greenbaum's estate until his death in 1927.

Plaintiff, as the administrator of Samuel Greenbaum's estate, filed this action seeking in substance to have the Greenbaum interest restored to a position of stock equality with the other three originators. The defendant Lena Roth

has, in effect, joined forces with the plaintiff so that she is not a "true" defendant.

It is apparent that each of the four originators possessed the same interest in the Corporation prior to the time the Corporation issued the 24 shares to Keil, Miller and Roth in September 1920. Plaintiff contends that the holding of the Market Street properties by the Corporation was merely the vehicle whereby four joint adventurers sought to exploit the property. He points to the many occasions when the affairs were transacted without particular regard for the corporate form. He suggests that because the originators and their successors ignored corporate formalities on many occasions the court is entitled to look on the purchase and retention of the property as a joint adventure. Having made the point that the court is actually dealing with a joint adventure situation, with the corporate aspect merely incidental, plaintiff then points out that the four joint adventurers—the originators—commenced with equal interests in the adventure. Having commenced with equal interests, plaintiff argues that their interests remained the same, and that the purchase of the 8 additional shares by the originators, other than Greenbaum, should be treated as loans to be repaid, rather than as increasing their respective interests in the enterprise. An alternative theory of relief suggested by plaintiff is that the issuance of the shares was a constructive fraud on Greenbaum because of the agreement of September 17, 1920, whereby the originators other than Greenbaum agreed to take care of Greenbaum's possible liability as an endorser on the corporate notes.

Let us assume, as plaintiff contends, that this was a joint adventure entered into by the four originators, and that the use of the corporate entity was merely a convenient way to effectuate their intent. However, there is nothing in the law of joint adventure which says that the joint adventurers may not alter their interests in the adventure after it is commenced. Let us see if this was done.

Certainly the originators used the corporate form to the extent that they issued stock to themselves for the first two advances made by each of them, viz., the $7,500. and $2,000. It is, therefore, of some importance to see what transpired with respect to the 8 shares issued in September, 1920 to the originators other than Greenbaum.

It is undisputed that Greenbaum as treasurer of the Corporation signed the stock certificates whereby the Corporation issued the 8 additional shares to each of the other three originators. Under the existing bylaws, Greenbaum's signature on the stock certificates was not indispensable, yet he was one of the signers. This is substantial evidence that the other three originators did not attempt to consummate the issuance of the shares to themselves without advising Greenbaum. Moreover, and of vast importance, the financial books of the Corporation were in the possession of Mr. Greenbaum, and while the entries are apparently not in his own handwriting, they do show the receipt by the Corporation of $2,400 received for subscriptions. Since these corporate records were in Greenbaum's possession and since he was treasurer, I believe these entries must be accepted as accurate. Certainly this would seem to be so where his successor in interest seeks to attack their accuracy. Greenbaum must, therefore, be charged with having had knowledge of the receipt of this money by the Corporation. Since the corporate records also record its purpose as being for "subscription", we must also charge him with knowledge of that purpose. This combination of facts most certainly leads to the conclusion that Greenbaum consented to the issuance of the 8 shares to the originators other than himself.

I conclude from the undisputed evidence, without reliance upon any evidence as to which objection was taken by plaintiff at the hearing, that Greenbaum actually knew of and consented to the issuance by the Corporation of the 8 shares of stock to each of the originators other than himself, with a resultant disparity in the stock interest of

the four originators. To this extent, the corporate aspect of the transaction cannot be ignored.

Plaintiff claims that Greenbaum had a pre-emptive right with respect to the issuance of the shares in question, and suggests that this right was denied him. Assuming that Greenbaum had such a right, nevertheless, plaintiff has not discharged his burden of showing that Greenbaum was not accorded that right. 1 *Cook on Corporations*, (8*th Ed.*) p. 961. Indeed, one of plaintiff's theories is that Keil, Miller and Roth authorized the issuance of the 24 shares well knowing that Greenbaum would be unable to subscribe for his share. It is at least implicit in this theory that Greenbaum was given an opportunity to purchase sufficient shares to enable him to retain his proportionate interest in the Corporation.

Plaintiff argues that the 24 shares were issued after the originators signed the agreement dated September 17, 1920. He suggests from this fact that it was constructively fraudulent for Keil, Miller and Roth to issue the 24 shares for money used to make a payment on the bank loan, since they had already obligated themselves to take care of Greenbaum's obligations under the September 17, 1920 agreement. What is the fact? Once again the documentary evidence is at variance with plaintiff's contention. Thus, the stock certificates for the 8 shares issued to Keil, Miller and Roth are each dated September 15, 1920, and the money obviously used in payment therefor is shown on the corporate books as being for "subscription". I conclude from the evidence that the transaction resulting in the issuance of the 8 shares each to Keil, Miller and Roth was completed before the signing of the September 17, 1920 agreement.

Even under plaintiff's theory, the stock certificates for the 8 shares issued each of the originators other than Greenbaum were issued on the same day that the agreement was signed. Plaintiff contends that the agreement was signed before the parties put forth the idea of issuing the

24 shares of stock. I cannot believe that such was the case, since it is almost inconceivable that Greenbaum would have signed the stock certificates for the shares knowing that he had previously, but on the same day, signed an agreement whereby the other originators were to protect him from liability with respect to the bank loans. Rather I believe the parties conceived and entered into the September 17, 1920 agreement after they had arranged to issue the 24 shares of stock for the $2,400 advanced by Keil, Miller and Roth.

Greenbaum was an active participant in each phase of each transaction. Certainly we cannot view this matter as though the other originators were concealing their actions from Greenbaum. The facts are quite to the contrary. No plausible reason is suggested why they—especially Greenbaum's father-in-law—should want to defraud Greenbaum. The evidence fails to reveal anything other than real friendship existing between the originators up until Greenbaum's death. Now, the fact as I find it is that the 24 share transaction was completed before the execution of the September 17, 1920 agreement. The agreement apparently was worked out afterwards to avoid the necessity for calling on Greenbaum for more money in his period of economic distress. At this time real estate values had plunged downward and Greenbaum was called upon to spend much more money on the theatre project than he planned. The evidence showed his need for cash. I find no evidence of fraud whatsoever in connection with the issuance of the 24 shares of stock.

The only remaining question is whether, as plaintiff contends, Greenbaum was so incompetent at the time of the transaction as not to be legally responsible for his actions.

Before discussing the evidence dealing with this point, it might be well to state a few principles of law which are applicable to this case. First, no interference of "legal" insanity is to be drawn from the fact of suicide alone. *Duffield v. Morris' Ex'r.*, 2 *Har.* 375. Insanity is not presumed.

Indeed, competency in business transactions is presumed, and therefore the burden of proof is imposed on one who would seek to upset a transaction on that ground. See *Warwick v. Addicks*, 5 *W. W. Harr.* 43, 157 *A.* 205, and *Reeve v. Bonwill*, 5 *Del. Ch.* 1. Having these legal principles in mind, let us now examine the testimony.

Let us first consider the testimony of Cornelius Greene and his wife, Clara. They were the only two witnesses on behalf of plaintiff who had no family or financial connection with this litigation. Mr. Greene, who is well along in years, was an electrician. The deceased often visited his home over the years, but they never talked business. He said that during the period of about a year before his death, Greenbaum was very nervous and had trouble concentrating. He testified that in his opinion the deceased was incompetent to handle his affairs during that period.

Clara C. Greene is the wife of Cornelius Greene. She worked for a good many years as a saleslady in a store owned by Greenbaum. While not working for him at the date of his death, she was in a position to observe his actions because he frequently visited her and her husband in their home. She also testified that Greenbaum was very nervous and could not concentrate in the period of about a year before his death, and she concluded that in her opinion he was incompetent during the period of several months before his death.

From my observations of Mrs. Greene on the witness stand and from the often incoherent nature of her testimony, I am loathe to give any particular weight to her evaluation of Mr. Greenbaum's mental condition. While Mrs. Greene testified that Mr. Greenbaum in her opinion was incompetent during the period in question, I am fully persuaded that her opinion was not justified by the testimonial facts which formed the basis for her opinion. It must be quite apparent that a person could be extremely nervous and have great difficulty in concentrating without being so unbalanced men-

tally as not to be able to understand the nature of a business transaction in which he was involved. Mr. Greenbaum's nervous condition is quite understandable when we realize that he was in deep financial distress during this period, and was also concerned about his wife's physical welfare. His temperament over the years indicates that he was always an excitable person.

Mr. Greene testified that he did not discuss business with Mr. Greenbaum, so we have only his testimony that Greenbaum was very nervous and couldn't concentrate, as the foundation for his conclusion that Mr. Greenbaum was incompetent. As in the case of Mrs. Greene's testimony, I conclude that Mr. Greene's conclusion was not justified by the facts upon which he based his conclusion.

We next consider the testimony of the "interested" witnesses produced by plaintiff.

First, we have Joseph Greenbaum, son of Samuel Greenbaum. He was living at home in 1920 and was about 21 years of age. Initially he testified that he "couldn't say that he [Samuel Greenbaum] was insane". He said that his father was "unbalanced through his worries". Still later he testified that by "mentally unbalanced" or "mentally sick" he really meant that his father was insane during the period of some six or seven months before his death. He testified that he heard his father groan in bed; that his father walked up and down, opened and closed windows and slammed doors. He said that his father worried and couldn't eat much and that he was depressed and lost weight during this period. He conceded that his connection with his father's business affairs was remote.

I think it quite clear that the facts testified to as forming the basis for Joseph Greenbaum's conclusion that his father was insane fall far short of justifying any such conclusion. They may show a person who is extremely worried, but they may even be consistent with acts of a person under no particular mental stress. Moreover, read-

ing the deposition of this witness as a whole, I gain the distinct impression that his testimony is vague and extremely unreliable. His shifting explanations as to his father's mental condition are not convincing, and I conclude that his testimony is not entitled to any weight in determining this issue.

The next witness on behalf of plaintiff who had an opportunity to observe Samuel Greenbaum daily was his daughter, Marion G. Breslin. She testified to about the same facts with respect to her father as did her brother Joseph, except that she testified that her father cried on occasions. I find nothing in the facts testified to by Mrs. Breslin which justifies her conclusion that her father was insane during the period of some seven months prior to his death. She testified that she had no knowledge of his business affairs and from my observations of Mrs. Breslin on the witness stand and from a reading of her testimony, I would say that her interest during the period in question was apparently on courtship to the exclusion of other considerations. The actions of her father were apparently judged by her in the light of their effect on her social life at that period.

Lena Roth, sister of Mrs. Greenbaum, testified that Mr. Greenbaum during some six to eight months before his death was deeply worried, depressed and refused to talk. Other descriptions of Mr. Greenbaum's mental condition are so vague as to be worthless here. I conclude that the facts upon which Miss Roth based her conclusions fall far short of constituting a basis for a finding of "legal" insanity.

Sarah Greenbaum, widow of Samuel Greenbaum, was quite ill and was at Saranac Lake, New York, from April, 1919, until about two days before her husband's death on January 8, 1921, at which time she returned to Wilmington. Her husband visited her only about three or four times during this period and his last visit was some time in August, 1920. During this period he only told her the good news and she testified that on his last visit, which was in August, his spirit was gone and he scarcely spoke. In the two day

period before his death, she testified he did not talk and was deeply worried.

In view of the fact that Mrs. Greenbaum did not see her husband from August, 1920, until two days before his death, it is evident that she was not in a position to observe his mental condition during that period. Her testimony as to his condition on his visit in August cannot possibly form the basis for inferring a lack of mental competence since the acts upon which she based her conclusion, standing alone, are far from sufficient to justify that conclusion. Mrs. Greenbaum's testimony as to her husband's conduct in the two day period before his death indicates nothing more than a deep concern and worry on the part of her husband. All the acts mentioned are consistent with a person laboring under great mental stress, but are insufficient to show the workings of an irrational mind. This testimony becomes even less valuable when we consider that we are here concerned with Greenbaum's mental condition some three to four months before his death. Mrs. Greenbaum's testimony cannot, in my judgment, form the basis for inferring that Mr. Greenbaum was legally incompetent in August and September of 1920.

Herman Greenbaum, a son of Samuel Greenbaum, lived with his mother at Saranac Lake during 1919 and 1920, and attended school there. He was not in Wilmington for a year prior to his father's death, and apparently only saw his father on the occasions when he visited Saranac Lake. His testimony is so patently inaccurate that it is of little value. Moreover, his conception of his father's actions while visiting Saranac Lake are at variance with his actions as recited by other witnesses. Thus, he said that his father was highly excitable. The others said he was greatly depressed. Assuming these conflicts can be resolved on the basis of different circumstances, nevertheless, considered in their settings they are not the actions of a man who did not appreciate what was going on around him. Indeed, Herman Greenbaum's testimony indicates quite to the con-

trary.  While Herman Greenbaum testified that he considered his father incompetent during the period in question, nevertheless, we have the situation once again where there is no testimony as to facts which would justify the conclusion drawn by the witness.

It must be noted that plaintiff failed to introduce evidence of one substantial act performed or word spoken by the deceased which may even remotely form the basis for the conclusion that it was the act or word of a man legally incompetent to understand the nature of his actions. All the factual testimony offered by plaintiff as to Samuel Greenbaum's mental condition fails to reveal a single act or word which is not entirely consistent with "legal" sanity. Not one shred of evidence was introduced to show Greenbaum's conduct in connection with his business affairs during the entire period.  This is indeed a significant omission even conceding that death may have silenced many who might have testified on this point.

I conclude from the evidence of plaintiff's witnesses alone, without considering the vigorous evidence to the contrary introduced by defendants, that plaintiff failed utterly to show that Samuel Greenbaum was not legally competent to appreciate the nature and consequences of his actions in connection with this Corporation in the months of August and September, 1920.  Since I have concluded that Greenbaum was fully competent to appreciate the consequences of his actions in August and September of 1920 when he, in effect, consented to a change in the interest of the four originators of the Market Street Realty project, it is quite immaterial whether or not the successors in interest to Samuel Greenbaum had knowledge of the transaction whereby the proportionate stock interest of Samuel Greenbaum in the Corporation was reduced.  Plaintiff is, therefore, not entitled to any relief with respect to the issuance of the 24 shares of stock in September, 1920.

An order accordingly will be advised on notice.

Note.  Reargument denied December 8, 1948.