IsAAC H. TAYLOR, Administrator of the Estate of Clarence W. Taylor,
Plaintiff,

*vs.*

VERA M. HOWETT, Executrix of the Will of Mary E. Taylor and
EQUITABLE SECURITY TRUST COMPANY, a corporation of the
State of Delaware, Individually and as Trustee u/a/w Mary E.
Taylor, dated June 16, 1953,
Defendants.

*New Castle, May 19, 1961.*

*William E. Taylor, Jr.,* and *A. James Gallo,* Wilmington, for
plaintiff.

*Max S. Bell, Jr.,* of Richards, Layton & Finger, Wilmington, for defendants.

MARVEL, Vice Chancellor: Plaintiff, who on May 10, 1955 qualified as administrator of the estate of his father, Clarence W. Taylor, brought this suit on May 23, 1955 for the purpose of having set aside a revocable trust agreement which Mary E. Taylor, wife of Clarence W. Taylor, executed shortly before her death on July 18, 1953, and in which Equitable Trust Company (now Bank of Delaware) was named trustee.

Plaintiff's theory of his case is that Mrs. Taylor, who was almost seventy eight years of age and ill at the time of the execution of the trust agreement and who had for many years relied for financial advice on certain officials of the defendant corporation, was persuaded to execute an agreement allegedly containing advantages to the bank and the defendant Vera Howett, a bank employee, while the advantages gained thereby by Mrs. Taylor were at the most minor; that the settlor was at the time not only senile and legally incapable of executing the document under attack but was also unduly influenced. A novel aspect of the action is that it is derivative in form, plaintiff as administrator of his father's estate (which would be benefited under the terms of Mrs. Taylor's last will and testament should the trust be set aside) having allegedly sued because demand for action from Miss Howett, executrix of Mrs. Taylor's estate, would be to no avail in the light of her long employment and loyalty to the corporate defendant and the part played by her in the preparation and execution of the trust agreement sought to be set aside. It is also alleged that others concerned in the execution of the trust were also employed by the bank and accordingly interested in promoting its business affairs rather than in the preservation of the decedent's estate. It is finally contended that the trust agreement under the terms of which the bulk of Mrs. Taylor's assets were siphoned off from what was shortly to constitute her estate was in effect a testamentary device not executed in conformity with the laws of Delaware governing the execution of wills. The relief sought in addition to the setting aside of the trust agreement is that the bank be ordered to account to the executrix for all moneys received by it as trustee and that plaintiff be awarded his costs and counsel fees.

In its answer the trustee admits the execution of the agreement and the receipt of the bulk of Mrs. Taylor's assets in trust as a result of the execution of the instrument which plaintiff attacks. It concedes that for a number of years prior to his death on October 15, 1950, Mrs. Taylor had relied on one John L. Carney, an employee of the bank, for financial advice but denies that it had more than two or three days prior notice of the suit. It admits no formal demand for action was made on the executrix and professes to have no knowledge as to whether or not a demand would have been nugatory. The answer concludes by denying that the trust agreement was in effect a will. All of these allegations are adopted by the executrix in her answer. Following a pre-trial conference the bank was permitted to plead the additional defense of laches.

The basic facts around which this dispute centers are not complex. However, those called to testify for and against the validity of the trust gave drastically conflicting pictures of the state of health of Mary E. Taylor during the period which elapsed between her departure from the Taylor lodgings in Atlantic City on April 6, 1953 and the date of her death in Wilmington on July 18 of the same year. And because the state of Mrs. Taylor's health at the time she created the trust is the underlying issue in this case it is incumbent on the Court to resolve this conflict in the light of the principle that proof of mental incapacity rests on the party alleging it, *Frazer v. Frazer*, 2 *Del.Ch.* 260; *Reeve v. Bonwill*, 5 *Del.Ch.* 1; *Eidelsburger v. Ballance*, 29 *Del.Ch.* 378, 50 *A.2d* 903, and *Greenbaum v. Keil*, 30 *Del.Ch.* 425, 62 *A.2d* 441. Further, it has been held that a virtual gift by deed to a son will be closely examined when the grantor is charged to have been lacking in mental capacity, *Jones v. Thompson*, 5 *Del.Ch.* 374.

Plaintiff would have the Court believe that on June 16, 1953 when she executed the document under attack Mrs. Taylor was so ill and disoriented by reason of cerebral arteriosclerosis as to be entirely incapable of understanding its significance, or at least senile to such a degree that she was improperly persuaded to execute a document which in addition to altering the pre-existing arrangements of her last will and testament for the benefit of her friend, Sarah Alexander, served no vital purpose.

The trustee on the other hand presents a picture of an apprehensive but mentally competent aged person who knew quite well what she was doing when a month before her death she executed a document which not only reasonably affected the dispositive scheme of her last will and testament but transferred title to her securities to a corporate trustee which could then not only pay her living and other expenses directly but handle more efficaciously matters having to do with the purchase and sale of stock and the like.

The chain of events leading up to the execution of the controversial trust agreement is as follows. Mrs. Taylor's stepdaughter, Mrs. Mildred Gault, having been notified by the Taylors' landlady by telephone on the night of April 6, 1953 that Clarence W. Taylor had suffered a stroke in Atlantic City, immediately brought both her father and her stepmother back to the Gault home in Camden, New Jersey by ambulance. The Taylors were then installed in a bedroom in the Gault home and Edwin A. Preis, a physician known to Mrs. Gault and who had treated members of the Gault family, was called primarily if not solely[1] to attend the stricken and paralyzed Mr. Taylor who for some time thereafter was bedridden. Mrs. Taylor remained at the Gault residence until May 14, 1953, at which time apparently not only to ease the burden on Mrs. Gault but in response to Mrs. Taylor's own wishes and Dr. Preis' suggestion she was moved to the home of Sarah Alexander in Wilmington. Mrs. Taylor's friendship with Mrs. Alexander, née Sarah Dougherty, dated back to their youth in Wilmington, a city where Mrs. Taylor was born and had lived until 1924, when at the age of forty-nine she married Clarence W. Taylor, a widower fifty-five years of age, and moved to Atlantic City. Perhaps it is needless to say their marriage was barren. In the light of Mrs. Taylor's later actions in reference to her property, a large part of which was apparently inherited from a brother, it is significant that throughout her

---

1. The doctor's daily log from April 6 through May 10, 1953, discloses seven Gault calls by him at his customary charge of four dollars for one person and one Taylor call on April 22 at a charge of five dollars. The doctor testified that he usually charged about seven dollars on a house call for two persons. His year book discloses seventeen Gault calls during the same period but does not disclose any charges.

life Mrs. Taylor was a devout Roman Catholic while her husband was not of that faith.

Notwithstanding the move to Atlantic City Mrs. Taylor maintained close ties with Wilmington. For instance during the period of almost thirty years between her marriage and death she continued to use Wilmington depositories for her not inconsiderable property and in two 1949 wills and a codicil to the latter executed in the year following, gave her address as Wilmington. In an earlier 1941 will she had to be sure stated her address to be Atlantic City but named the corporate defendant as executor or on its failure to qualify John L. Carney, a bank employee. Furthermore, I am satisfied that Mrs. Taylor during this period kept in touch with the Alexander family and with her personal advisers at the bank. Accordingly, assuming that she was then capable of rational decision, it was not unreasonable for her to move to the home of an old friend in Wilmington in May of 1953 in view of her husband's serious illness and the frailty of her own health. I am also satisfied that Mrs. Taylor for reasons personal to her never intended to make her husband her principal beneficiary in the event she predeceased him. Her 1941 will made no mention of him, and while her first 1949 will left Mr. Taylor certain specific items and a monthly allowance of $100 and a second 1949 will left him a third of the residue, the overriding intent apparent in the decedent's wills was that the bulk of her estate should be applied to the offering of appropriate masses and for Roman Catholic charitable purposes. The 1953 trust[2] into which substantially all of Mrs. Taylor's assets were transferred, however, vitally affected the husband's interest in the residue left under the 1949 will by virtually eliminating it. In lieu thereof provision was made for payment to the husband of $50 per month during the settlor's life or until the earlier death of her husband. Perhaps of even greater significance as a precipitating element in the present ligitation were the provisions of the trust which directed the payment of $200 per month to the

---

2. There is no question about the fact that Mrs. Taylor was not represented by her own attorney during the preparation and execution of the trust agreement. Why an independent attorney is a *sine qua non* to the preparation of a will and not when a bank is made trustee rather than executor was not made clear.

settlor's friend, Sarah H. Alexander, during the life of the trust or the earlier death of Mrs. Alexander as well as the payment of $15,000 to Mrs. Alexander or her issue before the ultimate distribution of the balance of the trust for religious and charitable purposes. However, it must be emphasized that under the terms of the trust the great bulk of her property was again allocated to religious and charitable purposes.

In the light of a background of failing health, past associations and loyalties, an obvious coolness towards her husband's relatives, and the serious state of health of her stricken husband who was some six years her senior and was being cared for by his daughter, it would appear to have been entirely reasonable for Mrs. Taylor to have made the arrangements set forth in the trust agreement, nonetheless the critical questions remain, was Mrs. Taylor in sufficiently good health to understand the nature of the act of executing the trust, or if she was able to comprehend the nature of the transaction under attack, was she possibly unduly influenced by financial advisers in whom she placed great confidence?

Dr. Preis testified categorically that on his first visit to the Gault home immediately following the Taylors' arrival he examined not only Mr. Taylor but a disheveled and soiled Mrs. Taylor; that he found nothing remarkable about her general physical condition, and that though thin, undernourished, and desiccated she "* * * seemed to be in reasonably good physical condition. But on further conversation, and so on, I elicited the fact that she did not know where she was, did not know with whom she was, and was totally disoriented as to time, place and person. On the basis of my examination and findings and her general appearance I made an original diagnosis of arteriosclerotic cardiovascular disease, and cerebral arteriosclerosis."

The doctor also described evidences of incontinence of bodily functions on Mrs. Taylor's part and testified as to her bizarre conduct on other visits. He insisted that not only was Mrs. Taylor incompetent on that first visit but that she remained so during his subsequent visits to the Gault home prior to her departure for Wilmington on or about May 14. In a non-medical way Dr. Preis' testimony is buttressed but also greatly elaborated upon and extended by Mrs. Gault,

a sister of the plaintiff. The picture painted by Mrs. Gault of her stepmother is one of a wandering, dirty, incoherent wreck of an old woman who was incapable of any rational decision. However, despite the lack of trial finesse evidenced by counsel in his effort to get into evidence letters written by Mrs. Gault about Mrs. Taylor after her departure from Camden I am satisfied that there was no fatal error in thus permitting her credibility to be impugned. Mrs. Gault as one of the heirs of Clarence W. Taylor was obviously unfriendly to the position taken by the corporate trustee. Accordingly, I conclude that such letters were not improperly admitted and that as a result Mrs. Gault's direct testimony concerning Mrs. Taylor's health is virtually worthless in the light of the contents of such letters. Insofar as the doctor is concerned I can only conclude that he mistakenly reconstructed recollections about a distraught and nervous person whom he first observed after she had precipitately arrived at the Gault home in Camden in the dead of night and who was not thereafter strictly speaking his patient.

On the other hand, the surviving Alexanders and the nurses at the Scott Nursing Home where Mrs. Taylor resided at the time of her death and where she had stayed for perhaps two weeks following her arrival in Wilmington while Mrs. Alexander wound up her official duties testified that Mrs. Taylor was at the time mentally competent though physically frail, was interested in people and things and happy to be living in familiar surroundings. Dr. Vitiello who had no records upon which to rely other than the death certificate[3] which he had executed and whose recollection of the case was to begin with virtually nonexistent ultimately agreed that Mrs. Taylor was not incompetent at the critical time.

There remains for consideration the testimony of the several bank officers who over objection were permitted to testify about the various conversations and meetings leading up to the actual execution of the documents whereby Mrs. Taylor consummated the revocable trust agreement sought to be set aside. Counsel for plaintiff contend that none of this testimony may be considered by the Court, this case

---

3. The cause of death is therein stated to "(a) senile arteriosclerosis due to heart disease (b) cardiac decompensation (sic)."

having in effect been brought on behalf of an executrix against the trustee and that consequently "\* \* \* neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, \* \* \* unless called to testify thereto by the opposite party. \* \* \*" § 4302, *Title* 10 *Del.C.* Furthermore, as plaintiff points out, the word "transaction" has been given a broad interpretation in the case of *Stoeakels v. Peoples National Bank of Laurel,* 6 *Terry* 478, 75 *A.2d* 433.

The trustee counters by arguing that plaintiff in effect called bank officers by first taking their depositions and then putting such depositions into evidence, and there is ample precedent for such argument; that in addition he has otherwise clearly waived his rights under the statute and that this type of statute, which has been severely criticized and restricted in a number of states, *Wigmore on Evidence (3rd Ed.)* § 578, may not logically be applied to corporate officers and agents. But see *Lake Shore National Bank v. Bellanca Aircraft Corp., D.C.Del.,* 83 *F.Supp.* 795, and compare *In re Denning,* 5 *Terry* 470, 61 *A.2d* 657. Finally, defendants contend that in any event according to the better reasoned cases the dead hand of this old disqualification statute should not be applied to exclude testimony concerning the mental competency of a decedent, 146 *A.L.R.* 256 *et seq.*

Entry into the jungle of cases concerned with so-called dead man's statutes is met on all sides by exceptions and qualifications as well as expert criticism, *Wigmore on Evidence (3rd Ed.)* § 578, and articles therein cited. My conclusion is that it is generally agreed that where the competence of the maker of a document such as the one here in issue must be resolved, an opposite party may testify as to the appearance and demeanor of a dead person insofar as such testimony is concerned not with the transaction itself but rather with the question of whether or not the decedent was in fact competent to act at the critical time. Over plaintiff's objection the testimony of Miss Howett will be accepted for this purpose, *Wigmore on Evidence* (3rd Ed.) § 227 *et seq., Vol.* 58 *Am.Jur., Witnesses* § 259, and *Citizens State Bank v. Kelley, Ind.App.,* 162 *N.E.2d* 322. When the testimony of such bank employee on this narrow issue of Mrs. Taylor's understanding during the period immediately antedating and postdating the

transaction (the employer of whom had nothing to gain financially by becoming a party to a transaction in which estate fees as agent for the executrix were exchanged for substantially equivalent trust fees) as well as that referred to earlier is considered in the light of letters[4] written by the decedent in the year ante litem motam, I am persuaded that Mrs. Taylor was legally competent to place her property in trust in June of 1953.

■ I am also of the opinion that the trust was not an improperly executed will, *Lewis v. Hanson,* 36 *Del.Ch.* 235, 128 *A.2d* 819, and the case of *Peyton v. William C. Peyton Corp.,* 23 *Del.Ch.* 321, 7 *A. 2d* 737, 753, 123 *A.L.R.* 1482, where the supposed benefit to the wife in the transaction under attack was very possibly a case of a husband's causing "substantial injury to her property interests" is not in point. The bank clearly had had no ulterior purpose to serve and served none.

In view of the conclusions herein reached as to the lack of merit in plaintiff's claim there is no need to consider the defense of laches, and on notice an order entering judgment for the corporate defendant individually and as trustee may be submitted.

---

4. These so-called verbal acts while hearsay carry the mark of authenticity and truth. Compare *Gagnon v. Pronovost,* 97 *N.H.* 500, 92 *A.2d* 904, and see *Wigmore on Evidence (3rd Ed.)* § 1576. I also think it significant that Mrs. Taylor's signature to the trust agreement (the introduction of which into evidence was, of course, not questioned) is firm and clear.