GEORGE SIMS, Guardian of the Estate of John W. Nichols, and
CARRIE L. NICHOLS,
Plaintiffs,

*vs.*

ABRAHAM M. SLOVIN and ELEANOR SLOVIN, his wife, and
MILTON N. SLOVIN and EDITH SLOVIN, his wife,
Defendants.

*New Castle, February 5, 1965.*

*Thomas Herlihy, Jr.,* and *Theophilus R. Nix,* Wilmington, for plaintiffs.

*James M. Tunnell, Jr.,* and *John T. Gallagher,* of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants.

MARVEL, Vice Chancellor: The original complaint herein sought rescission of an accomplished sale of real estate together with injunctive relief against the committing of waste pending the granting of such primary relief. Said complaint alleged that on "* * * or about December 4, 1962 or 1st day of May, 1963 * * *", plaintiffs, who were at the time over 78 years of age and in "* * * relatively poor health and hard of hearing * * *", and the defendant Abraham Slovin "* * * entered into a contract for the sale of 71 acres of land for $5,500 situated in Pencader Hundred * * *". The original complaint goes on to state that settlement of the proposed transaction took place on June 28, 1963, at which time plaintiffs executed a deed which purported to convey the lands in question to defendants in accordance with the terms of the May 1, 1963 agreement which is attached to the complaint as an exhibit. This agreement is a formal version of the parties' written agreement of December 4, 1962 and was contemplated at the time of the making of such original agreement. While the later agreement further extended the original settlement date to an outside date of August 4, 1963, it does not vary the basic terms of the agreement reached by the parties on December 4, 1962.

The main thrust of the complaint was that the defendant Abraham Slovin, having allegedly sought out plaintiffs in Philadelphia, thereupon proceeded, after plaintiffs had professed to owning seventy-one acres of land in Pencader Hundred, falsely to represent to them that said lands were worth only $5,500. As a result of such inducement, plaintiffs were allegedly caused to agree to sell. Plaintiffs also contend that as a further result of such defendants' claimed misrepresentations they were also induced to institute a suit for specific performance of contract, the same being C.A. 1817 in this Court, and in the case of John W. Nichols to sign an affidavit in support of such suit. It is claimed that as a result of being induced to sign such affidavit Mr. Nichols was caused unknowingly to represent, by means of

reference to a survey attached to the complaint, that plaintiffs were in fact the owners by adverse possession of 100.43 acres rather than the 71 acres, more or less, covered by the agreements of sale. Plaintiffs further allege that either they were deliberately misled concerning the actual acreage of their property and its value (which they contend to have a value of upwards of $15,000), or, at the least, that there was a mutual mistake of fact as to such matters. The land in question fronts narrowly on Magnolia or Frazier's Road and lies between State roads 392 and 396.

A motion for a restraining order was granted on August 14, 1963 for the purpose of preventing waste by defendants and in order generally to preserve the status quo pending final hearing on the issues raised by plaintiffs' prayers for rescission. On September 17, 1963, defendants answered the complaint, demanding proof as to plaintiffs' allegations concerning their age and health and the like, and averring that the cash consideration provided for in the parties' written agreements had been paid by defendants. The answer concluded with a prayer for judgment in defendants' favor.

Thereafter, heirs of one Lewis Money, purporting to be the actual owners of part of the land conveyed to defendants by plaintiffs, sought to intervene in this proceeding in order to assert their claimed rights to a portion of the lands which plaintiffs conveyed to defendants after entry of final order in C.A.1817. Such motion having been brought on for argument, it was denied without prejudice as being premature. In the meanwhile, discovery was carried on by both sides, and after some delay in reaching trial (during which plaintiffs were required to post additional bond against the incurring of reimbursable losses and expenses attributable to the restraining order), a guardian was appointed for the plaintiff John W. Nichols, shortly before the commencement of the continued trial. Such appointment was made by the Orphans' Court of Philadelphia County, Mr. Nichols' domicile. Leave was thereupon granted plaintiffs to file an amended complaint in the names of George Sims, guardian for the adjudged incompetent, John W. Nichols, and his wife, Carrie L. Nichols.

Such complaint adds to the original complaint by alleging that from 1960 until the present John W. Nichols has been mentally

incompetent due to mental illness and so incapable of contracting for the sale of land here involved. It is also alleged therein that by reason of impaired ability to reason due to organic brain damage associated with cerebral arteriosclerosis, the contracts here in issue, the action for specific performance brought by plaintiffs against defendants, and finally the deed signed by Mr. Nichols in connection with said action are voidable on the grounds of the latter's mental incapacity. Said complaint also disavows any claim by plaintiffs to lands of the would-be intervenors, the Money heirs, on the basis of adverse possession, and prays for the affirmative relief of rescission of the documents referred to above together with a vacating of the decree entered in the aforesaid suit for specific performance, namely Civil Action 1817 in this Court.

Also filed were defendants' response to plaintiffs' amended complaint, consisting of the denial of the relevant allegations thereof and the setting up of the affirmative defense that the allegations as to the incapacity of John W. Nichols are assertable only as to his own interest in the lands involved in the transaction under attack, it being contended that other owners of the lands in controversy, namely other heirs of Isaac W. Nichols, having entrusted the sale of the family homestead to John W. Nichols, are estopped by their inaction from having their interests involved in a rescission of the sale here under attack regardless of the alleged incompetence of their agent, John W. Nichols.

At the time of the original agreement of December 4, 1962, John W. Nichols was seventy-seven years of age. As a youth he had lived on the family property and had attended a small country school at Bethesda in Pencader Hundred up to the fourth grade. He had no other formal education. He was, however, employed during most of his adult life as a mail sorter for the Pennsylvania Railroad and reads and writes within the limitations of a modest vocabulary. After retirement, following thirty-six years of employment by the railroad and until his advancing years made the use of stepladders and the like hazardous, he performed the duties of sexton at a church across from his home. At the beginning of his railroad employment he had established a home in Philadelphia which he owns and where he, his

wife and a sister still live. Prior to his marriage in 1916 and subsequent move to Philadelphia for employment by the Pennsylvania Railroad he had worked as a domestic servant after performing farm work in the vicinity of his family's home. While the rest of the family appear to have moved from the family homestead many years ago, until his death some four or five years ago, a brother, James I. Nichols, had continued to live in a small house on the family land. Some time after December 4, 1962, his home burned down. In 1930, the heirs of Isaac W. Nichols had joined in a deed to John W. Nichols which conveyed two parcels of land in Pencader Hundred, purportedly containing within their metes and bounds the lands here in dispute, the same having been properties allegedly conveyed to Isaac W. Nichols over a hundred years ago. Although such conveyance was made to make Mr. Nichols a selling agent, from 1930 until the death of the brother, James, little was done by John W. Nichols about the family land, although he did look after it to the best of his ability, and James, of course, lived there until his death. After James' death, for a nominal sum Mr. Nichols permitted James K. Case, a neighbor, to cultivate a portion of the tract for a period of one year. However, in 1962 pressure appears to have been brought on John by his surviving brothers and sisters to find a buyer for the lands in question, and he set about this task, recognizing that proportionate shares of the moneys realized from such a sale would be distributable to members of his immediate family. It is not clear why the evident interest of cousins in the proceeds of any such sale was not recognized by the members of the Nichols family here involved. In any event, Mr. Nichols' plan appeared to be to obtain at least $5,000 net for the property which would mean cash in the minimum amount of $1,000 for himself and a like amount for each of his surviving sisters and brothers. Over objection of plaintiffs' attorney, defendants were permitted to show that after preliminary negotiations, which were instituted by the prospective buyers, plaintiffs, on June 5, 1962, entered into a contract for the sale of "* * * 76 acres more or less situate in Pencader Hundred * * *" to Edgar W. Holcomb and Mary W. Holcomb, his wife, for $5,300, with the provision, however, that if upon survey of the land it should prove to contain less than 75 acres the purchasers would have the option of withdrawing from the agreement

and having their deposit of $500 returned. However, the purchasers, having been advised by their lawyer that the title to the land in question was such that they would possibly be buying a land-locked parcel and incurring the risk of a suit concerning access thereto, asked to be released from their agreement and Mr. Nichols returned the deposit.

Shortly afterwards, Mr. Nichols entered into negotiations with John K. Case, after Mr. Case had expressed interest in acquiring the land. According to his testimony, Mr. Case orally agreed to pay $5,000 for the property after Mr. Nichols had indicated that he thought he should receive $7,000 or $8,000. Although a written agreement was not entered into, after Mr. Slovin had agreed to pay $5,500 for the property, Mr. Nichols courteously declined to enter into a formal agreement as to such ultimately consummated sale until Mr. Case had released him from their informal agreement. Mr. Nichols also testified to earlier tentative discussions with a Mr. Cook, who had offered $3,000 for the property. When asked as to why he declined to accept such offer, Mr. Nichols replied—"Well, if I had been offered five, I didn't see I should drop back to three."

During these negotiations, Mr. Nichols, other than for a display of irrelevant forgetfulness in connection with his dealings with Mr. Case, kept appointments except in one instance, when a friend who had promised transportation let him down. He appears to have been spry and active for one of his years during his negotiations with those interested in the land. When his arrangement with Mr. Slovin was finally consummated, Mr. Nichols, while of the opinion that the expense to which Mr. Slovin had gone to delineate and perfect title to the lands was unnecessary and that the Money land lay on the far side of Magnolia Road, appeared to be satisfied with the arrangement as concluded except for that part of it which entailed the return by him to Slovin of $500 for the alleged purpose of helping to defray a part of the not inconsiderable expenses involved in bringing about the transfer to the Slovins. The survey of the Nichols land had cost $1,597.50, and the fee of the Slovins' attorneys was $2,500. In addition, Mr. Slovin has paid rent of $125.00 per month for dumping rights on other lands from the time of the entry of the restraining order, and if successful in the present litigation, faces the expense of building a

costly road for his planned dump operation, access on higher ground through the neighboring Zerinski tract now being barred.

In attacking the transaction complained of, plaintiffs point not only to the advanced age and failing health of John W. Nichols but to what they contend was the grossly inadequate price ultimately paid for the land, *Jones v. Thompson*, 5 *Del.Ch.* 374. They also contend that Morton E. Evans, who acted as Mr. Slovin's attorney in the transaction, failed to protect the Nichols' basic interests and caused them to sign papers which they did not and could not possibly understand. Compare *Holley v. Jackson*, 39 *Del.Ch.* 32, 158 *A.2d* 803.

First of all, on the basis of the evidence of record, it is clear that Mr. Nichols is not and has not been mentally ill during the past two and one-half years and that the handicaps under which he labored in the transaction under attack were attributable to his age, the consequences of arteriosclerosis, and the absence of education. There is no doubt but that John W. Nichols, at the time of the transaction, had suffered substantial deterioration to his arterial system, which, as in most persons of advanced years, had hardened, thereby precipitating physiological changes, particularly of a cerebral nature. As a result, his capacity for recollection of recent events was reduced, while his memory of distant happenings was relatively clear. But to what degree his inability to solve psychological tests with any degree of success or his tendency to forget names rapidly and to be vague in matters of food, personal care and the like are attributable to brain changes rather than to his basic personality is, of course, difficult to ascertain. In Court, he was neatly dressed, and appeared to give close attention to what was going on. On the stand he was quiet and rational, and no valid reason is advanced as to why his testimony was not properly taken, *Vol.* 58 *American Jurisprudence, Witnesses*, § 121. Mr. Nichols had suffered what was probably a disabling stroke in 1960 during a trip to California after which he was quite ill for some time although there is no record of hospitalization. A Parkinson-like tremor in his hand and arm as well as in the lower jaw area was apparent during his attendance at trial. Also, as alleged in the original complaint, he proved to be hard of hearing, and during the trial, at the Court's suggestion, moved near the witness chair during

Mr. Slovin's testimony. Although he professed to having a hearing aid, he indicated that its batteries were lifeless and did not use it in Court. His left hand was often cupped to his ear during the course of trial.

According to all of the expert testimony, other than that of M. A. Tarumianz, M.D., Mr. Nichols, because of brain damage and the chronic nature of his arteriosclerosis with its syndromic effect on the functioning of his mental powers and emotions, was not able, as of the time he agreed to and assumed the undertakings set forth in the various papers here under attack, to understand complex problems such as those presented to him in connection with the transaction under attack. In other words, in the light of his arterial impairment of a cerebral nature, his age, his scanty education combined with a cultural naiveté, it is clear that such legal concepts as the fixing of external property lines by relating them to those of contiguous record owners, the abortive results of tracking down his family's record title, the nature of adverse possession, and the need for a suit for specific performance were not comprehended by Mr. Nichols. Therefore, it is quite understandable that he should be considered medically incompetent to grasp the technicalities of the legal and business steps presented to him for appropriate action, particularly in a situation in which the deed on which he relied was found to relate to lands now occupied by others and proved no help in establishing the boundaries of his family's tract. And on the basis of both the information furnished to these experts prior to and in connection with office interviews and the questions addressed to them by their attorneys in Court, their medical opinion is logical and understandable. The point is, however, that it is not the technical legal aspects of this transaction (and by that I mean concepts of adverse possession, specific performance and the like), but the dealings between a willing buyer and a willing seller which must here be tested, and then under legal and not psychological principles. The contract with Mrs. Holcomb, the negotiations with Mr. Case, and finally the consummated contract with Mr. Slovin, all point to the fact that while the figure of $7,000 or $8,000 had been broached to Mr. Case, Mr. Nichols during 1962 had his mind set on a sale which would net the sum of at least $5,000. When he received an offer of $5,500, a bid based on what Mr. Slovin

had learned about an earlier offer, Mr. Nichols readily accepted it. In fact, while on the stand, Mr. Nichols indicated that his dissatisfaction with the transaction lay in his not "* * * being taken care of * * *" to the extent that he had expected, in that, contrary to the parties' agreement, he had been urged to share the burden of the buyers' surveying expenses to the extent of $500.

According to Dr. Tarumianz, Mr. Nichols, at the time of trial, was capable of understanding the nature and effect of a transaction such as the sale and conveyance of real estate, and that in all probability, his condition was better two years earlier. Furthermore, Dr. Lieberman conceded that Mr. Nichols would recognize the difference between $5,300 and $3,000, a difference Mr. Nichols essentially recognized on the stand. In other words, this is not the case of a man signing a deed in a state of "* * * senile imbecility * * *", nor are we concerned with a conveyance to a near relative for either no or grossly inadequate consideration. Compare *Jones v. Thompson, supra,* in which a senile father, to whom the nature, character and legal effect of the deed he signed was not fully or sufficiently explained, for no consideration paid or secured, conveyed his major asset, a farm worth $15,000 to $20,000 in 1880, to a son and daughter thereby unreasonably excluding three other living children. Finally, Mrs. Nichols, who was admittedly entirely competent, merely signed what her husband urged her to. She accepted his decisions, particularly as to his family's land, even though she was obviously unenthusiastic about the so-called gift to Mr. Slovin. Her role in the transaction was clearly passive.

Turning to the question of the amount agreed to be paid for the land, I am satisfied that such amount was not only in excess of what had been offered in what could properly be called a limited market, but was in line with what I find to be the acceptable expert testimony. Not only is the land in question low and poor in quality, covered for the most part with relatively small gum trees, wild cherry and other scrub growth, but is also subject to some doubt as to free access. At the best it has a relatively narrow frontage on Magnolia Road. Unlike other nearby tracts it contains no barns, dwelling house, or other improvements, factors which give a greater value to such other tracts.

In addition, they are for the most part tillable. Being wooded, marshy and without topsoil, the land in issue has little present value except as a hedge against a demand for housing in twenty or twenty-five years. When such value is discounted, the present value of such lands lies somewhere between fifty and seventy-five dollars an acre. Mr. Slovin's purpose, on the other hand, is to operate a dump, an operation which calls for space but not an express number of acres. Significantly, if the tract had proved to contain somewhat less than 71 acres Mr. Slovin presumably would have been bound. There is no evidence of record that a higher bid for such use was made to Mr. Nichols at any time.

Proof of mental incapacity rests on the party alleging it, *Frazer v. Frazer,* 2 *Del.Ch.* 260; *Reeve v. Bonwill,* 5 *Del.Ch.* 1; *Eidelsburger v. Ballance,* 29 *Del.Ch.* 378, 50 *A.2d* 903; *Greenbaum v. Keil,* 30 *Del.Ch.* 425, 62 *A.2d* 441, and *Taylor v. Howett,* 39 *Del.Ch.* 569, 170 *A.2d* 917. Plaintiffs have not, in my opinion successfully carried such burden. There being no indication of mental illness but merely a showing of a gradual weakening of mental capacity it was incumbent on plaintiffs to show some unfair practice or imposition sufficient to persuade the Court that there was in fact overreaching under the circumstances. Furthermore, the testimony about his substantial investment towards improving his house heating problem in Philadelphia, business dealings which may have been wise or unwise under the circumstances, does not change my views as to his capacity to contract in 1962 and to convey in 1963.

The land, when surveyed, disclosed that slightly over a hundred acres rather than seventy-one or seventy-five lay outside neighboring recorded boundaries of others and thus subject to a claim of adverse possession by the Nichols family. As noted above, such acreage might have proved to be less, and the 1930 deed, of course, conveyed some fifty-two acres. In this connection, it is of some interest to note that the escape clause in the Holcomb contract, which applied if less than 75 acres should be found in the tract, does not appear in the Slovin agreement. There is also no doubt, as noted earlier, but that Mr. Nichols did not comprehend the precise nature of the action for specific performance and that in agreeing to Mr. Evans' plan for an ami-

cable action to establish title had doubts about its need. Nonetheless, in my opinion, he was not put upon except for being cajoled into giving up $500 of the agreed consideration to be applied to the cost of the survey. It was no doubt unwise for Mr. Evans, in signing a complaint on their behalf, to appear to represent the Nichols in the specific performance action. The fact is he did not represent them and so did not owe them a duty of undivided loyalty. I am also satisfied that Mr. Evans took professionally adequate steps over a long period of time, during which the boundaries of a trackless parcel were being slowly delineated, to explain to or have explained to Mr. Nichols the acts he was taking for his actual client, Mr. Slovin. It is entirely clear on the record that Mr. Nichols wanted no expense of the transaction to fall on him, and it was for this reason that he resented Mr. Slovin's successful importuning that he be furnished help in meeting his heavy expenses.

As to the $500, which is listed on the June 28, 1963 settlement sheet as "* * * contribution to expenses of transfer * * *", I am satisfied that such alleged gift was not freely given but was the result of undue pressure on Mr. Slovin's part. And while I have held that Mr. Nichols was competent to make the sale under attack for the price agreed upon, I am satisfied that under the circumstances of his age and health, the clear understanding that he would bear no expenses of the transaction, and because of the fact that he was not represented by counsel, that this so-called gift must be rescinded.

Finally, regardless of Mr. Nichols' over-all competence to deal with his personal interest in the family tract, I have no doubt but that he was competent to act as agent for members of his family and that they are bound by his contracts and deed insofar as their interests were conveyed to defendants. One not clearly mentally ill may act as an agent for others even though incapable of acting for himself, *Vol. 2 C.J.S. Agency* § 14.

On notice, an appropriate order may be presented.